**METAL COATING CORPORATION,**
Plaintiff,

v.

**BAKER MANUFACTURING COMPANY,**
Defendant.

Civ. No. 3550.

United States District Court
W. D. Wisconsin.

July 26, 1967.

William A. Marshall and Alvin D. Shulman, Merriam, Marshall, Shapiro & Klose, Chicago, Ill., Beckwith & Hollern, Madison, Wis., for plaintiff.

Paul R. Puerner, Michael, Best & Friedrich, Milwaukee, Wis., Edwin C. Pick, Ross, Stevens, Pick & Spohn, Madison, Wis., for defendant.

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

This is an action for infringement of Patent No. 3,030,891 issued April 24, 1962. The patent states that Stephen M. Taylor is the inventor and assignor to Metal Coating Corporation, plaintiff in this action. The device shown in the patent in suit was developed by Taylor beginning in April 1956. Plaintiff acquired the Taylor device during the prosecution of the Taylor patent, and the patent eventually issued in the name of plaintiff. The original Taylor patent application Serial No. 606,132 was filed August 24, 1956, and was later abandoned. A second application Serial No. 862,103 was filed on December 28, 1959, and a third application Serial No. 58,-597 was filed on September 22, 1960. The patent in suit issued from this last divisional application.

This action was commenced in this court on April 25, 1962. Defendant filed a counterclaim for a declaratory judgment on April 15, 1963. On March 31, 1964, partial summary judgment was granted to defendant, 227 F.Supp. 529 (W.D.Wis.1964), thereby removing certain claims from the case. On October 12, 1966, the parties by stipulation agreed that plaintiff could file a supplemental pleading charging defendant with infringing the patent in suit by making and selling its radially-ribbed fluted float, in addition to its segmented float. Trial of this action to the court took place on January 16–18, 1967. Extensive posttrial briefs and proposed findings of fact and conclusions of law have been filed.

Plaintiff is a Delaware corporation having its principal office and place of business in Chicago, Illinois. Since the start of this lawsuit plaintiff has changed its name to MCM Industries, Inc. Plaintiff is the owner of United States Patent No. 3,030,891, by assignment from Stephen M. Taylor.

Defendant is a Wisconsin corporation having its principal office and place of business in Evansville, Wisconsin, in the Western District of Wisconsin.

The court concludes that proper parties are prosecuting and defending this lawsuit. This court has jurisdiction over the parties and subject matter of this action, and venue is proper in the Western District of Wisconsin. 28 U.S.C. § 1338 (a); 35 U.S.C. § 271; 28 U.S.C. § 1400 (b).

This opinion and order is based upon a full consideration of all the exhibits, files, records, and proceedings in the above entitled matter. This opinion and order embodies findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.

Plaintiff contends the defendant is a direct infringer, under 35 U.S.C. § 271 (a), of Claims 15, 18, and 19 of the patent in suit because of the sale by defendant of pressure tanks containing the Baker segmented float. Plaintiff contends that defendant is a contributory infringer, under 35 U.S.C. § 271(c), of Claims 1 to 10 of the patent in suit because defendant sold pressure tanks with its radially-ribbed fluted floats, knowing that these tanks have been put to no use other than in water supply systems covered by these claims. For the same reason, plaintiff contends that defendant is guilty of inducing infringement of Claims 1 to 10, under 35 U.S.C. § 271(b). Plaintiff contends that defendant is a direct infringer of Claims 11 to 14 of the patent in suit because of the sale by defendant of its fluted floats per se. Plaintiff contends that defendant

is a direct infringer of Claims 15, 16, 18, and 19 of the patent in suit because of the sale by defendant of pressure tanks containing its fluted float.

The claims in question read as follows:

"1. A liquid supply pumping system comprising in combination a liquid pressure tank having inlet and outlet means at the bottom thereof, said tank being sealed to prevent undesired escape of gas to the atmosphere, pump and conduit means communicating with said inlet and outlet means of the tank for supplying liquid under pressure to said tank and increasing the pressure therein, said inlet and outlet means of said tank being constantly open and valveless, check valve means operatively associated with said pump and conduit means so that the liquid cannot flow from the pressure tank to the pump, pressure-responsive means constructed and arranged with said tank and pump to actuate said pump to on-off conditions in response to predetermined pressure variations in said system, said tank having a liquid-gas separation float therein in the form of a disk having a peripheral edge conforming to the cross-sectional shape of the tank but being slightly smaller in size, the peripheral edge of said float being spaced inwardly of the tank to provide a narrow, substantially annular column of water between the tank and the peripheral edge of the float, the spacing between said peripheral edge and the tank and said substantially annular column of water being sufficiently narrow to obviate the ready ingress of air to beneath the float, said float comprising a free-floating disk of air- and water-impervious, substantially rigid material and being buoyant in water, said disk having a lower face that floats in water while exposing an upper face substantially above water during continued usage so as to be normally dry, said air- and water-impervious, substantially rigid float material preventing the float from being compressed or waterlogged and

lowering its upper face to the extent that it is no longer substantially above the level of the liquid of the tank during usual pressure changes in the tank over an extended period of operation.

"2. The system of claim 1 wherein the disk material is made of synthetic plastic having closed discrete cells.

"3. The system of claim 1 wherein the disk material is expanded polystyrene.

"4. The system of claim 1 wherein the disk has a central web and a flanged peripheral edge extending below the web.

"5. The system of claim 1 wherein the disk has a central web, a flanged peripheral edge extending above and below the web, and said web has air- and water-permeable holes that extend therethrough.

"6. The system of claim 1 wherein the disk has a central web, a flanged peripheral edge extending above and below the web, said web has a central opening extending therethrough that permits the escape of water from below to above the web, and said web has air- and water-permeable holes that extend therethrough adjacent the flange to provide for run-off of water.

"7. The system of claim 1 wherein the diameter of the disk is about ⅝ inch less than the diameter of the pressure tank.

"8. The system of claim 1 wherein the thickness of the disk at its peripheral edge is at least about 1 inch.

"9. The system of claim 1 wherein the diameter of the disk is not more than about ⅝ inch less than the diameter of the pressure tank and the thickness of the disk at its peripheral edge is at least about 1 inch.

"10. The system of claim 1 and including means to permit the escape of liquid from below the disk to above the disk when the disk approaches the top of the tank.

"11. An air-separating water float for use in a hydro-pneumatic tank of a water supply system that includes pressure regulating means in operative association with said tank, said float comprising a cellular free-floating disk of air- and water-impervious, substantially rigid material having a density less than water, said disk having a central web and a flanged peripheral edge extending below the web, said peripheral flange cooperating with the side walls of a water-containing hydro-pneumatic tank to provide a narrow extended, substantially annular, air-saturated column of water that serves as an air barrier and to provide a turbulence deflector, said web defining a lower face that floats in water while exposing an upper face substantially above the water during usage so as to be normally dry, said material having air- and water-impervious cells proportioned and shaped to provide rigidity and prevent the float from being compressed or waterlogged and submerging its upper face during usual pressure changes in the hydro-pneumatic tank.

"12. The float of claim 11 wherein said peripheral edge extends above and below the web, and said web has air- and water-permeable holes that extend therethrough.

"13. The float of claim 11 wherein the disk material is a synthetic plastic having closed discrete cells.

"14. An air-separating water float for use in a hydro-pneumatic tank of a water supply system that includes air volume control means and pressure regulating means in operative association with said tank, said float comprising a cellular free-floating disk of air- and water-impervious, substantially rigid, polystyrene material having closed discrete cells and a density less than water, said disk being symmetrical about a horizontal plane and having a central web and a flanged peripheral edge extending above and below the web, said peripheral flange cooperating with the side wall of a water-containing hydro-pneumatic tank to provide a narrow, extended, substantially annular, air-saturated column of water that serves as an air barrier and to provide a turbulence deflector, said web defining a lower face that floats in water while exposing an upper face above the water during usage, said web having a plurality of spaced transverse air- and water-permeable holes that extend therethrough adjacent the flange, said material having air- and water-impervious cells proportioned and shaped to provide rigidity and prevent the float from being compressed or waterlogged and submerging its upper face during usual pressure and air volume changes in the hydro-pneumatic tank.

"15. A hydro-pneumatic tank assembly adapted for use in a water supply system that includes pressure regulating means in operative association with said tank, said assembly comprising a hydro-pneumatic tank having side walls, a top and bottom, inlet and outlet means at the lower portion thereof of relatively small size as compared to the cross-sectional area of the tank, said inlet and outlet means being constantly open and valveless and providing free egress of water and gas from the tank when the water level in the tank is lowered to communication with said inlet and outlet means, and pressure-responsive means operatively associated with said tank that is responsive to predetermined pressure variations in said assembly, said tank having a water-air separation float therein in the form of a free-floating disk having a peripheral edge substantially conforming to the cross-sectional shape of the tank but being slightly smaller in size and cooperating with said side walls of the tank to obviate the ready ingress of air from above the float to beneath the float, said hydro-pneumatic tank assembly including means for coaction between said disk and said tank at the upper portion of said tank to prevent the disk from being permanently deformed at the top

of the tank by upward movement of the water level in the tank, said float being buoyant in water and comprising a free-floating disk of air- and water-impervious, non-liquid material, said disk having a lower face that floats in water while exposing an upper face above the water level in the tank during continued usage, said air- and water-impervious float material preventing the float from being waterlogged and submerging its upper face below the level of the water in the tank during the usual pressure changes in the hydro-pneumatic tank over an extended period of operation.

"16. The assembly of claim 15 wherein the upper and lower faces of the disk are defined by a central web, and a flanged peripheral edge extends below the web to provide an extended, substantially annular column of water outwardly thereof.

"18. The assembly of claim 15 wherein the disk material is a synthetic plastic material having closed, discrete cells.

"19. The assembly of claim 15 wherein the diameter of the disk is not more than about ⅝ inch less than the diameter of the circular side walls of the tank."

In rural areas electric motors are used to drive pumps for moving water from the well to the house or other point of use. A closed hydropneumatic pressure tank is installed between the pump and the water outlet. The pressure tank, which in effect stores energy, serves as a balance between operation of the pump motor and water use demands. Without the pressure tank the pump motor and the switch operating the motor would have to be turned on and off each time water was to be used, no matter how small the amount to be used. This is a problem since excessive switching causes electric motor failure.

When the pump motor starts, in the conventional system, it pumps water into the bottom of the tank. Water rising in the tank compresses air in the top of the tank to a predetermined pressure, usually 40 p.s.i., which is the maximum operating pressure of the system. When this occurs, a pressure-responsive switch in the system senses the pressure and shuts off the pump motor. The compressed air in the top of the tank is called the "air head" or "air dome" or "air cushion."

The opening of faucets or valves allows the compressed air in the tank to expand and force water from the tank. In expanding, the air decreases in pressure. When sufficient water is withdrawn from the tank, the pressure is reduced to a second predetermined value, usually 20 p. s. i., which is the minimum operating pressure for the system. When this occurs, the pressure switch starts the pump motor, and the pump forces fresh water into the tank until the air in the tank is again compressed to the first predetermined pressure. A system of this type is completely automatic.

For optimum operation of the system, a proper air-water volume ratio, or air head, must be maintained in the pressure tank. When the tank contains too much water in proportion to air, it is said to be "waterlogged." The proportion of water to air in a hydropneumatic tank tends to change because air in the tank is absorbed by water. The greater the amount of air which is absorbed by water in the tank, the greater the extent of waterlogging. A waterlogged tank causes the pump to "short cycle," or start and stop, when only small amounts of water are used. This condition shortens the life of the electric motor on the pump. This is the same problem which occurs in a system which does not have a pressure tank.

A variety of devices, including mechanical air volume controls, airbags, oil films, and the like, have been used in attempting to cope with the problem of waterlogging. All of these devices have drawbacks and none can be relied upon as a foolproof, relatively permanent device to maintain a proper air-water volume ratio. When such air volume control devices fail, the tank in which they

are contained becomes waterlogged. Before 1959 waterlogging of a hydropneumatic tank due to failure of the air volume control device was the biggest single cause of service calls made by servicers of automatic water systems.

The invention claimed in the patent in suit relates to the use of a free-floating air-water separating float in a vertical hydropneumatic pressure tank of the type generally installed in rural domestic water systems. The air-water separating float is in the form of a disk having a peripheral edge that substantially conforms to the cross-sectional shape of the tank but is slightly smaller in size. The disk prevents air in the tankhead from being absorbed in the water and thus minimizes waterlogging of the pressure tank under service conditions.

The float performs its work by acting as a barrier between the air and water, leaving only a small clearance between the periphery of the float and the side of the tank, and by preventing the air from getting under the float at its periphery.

The periphery or outside edge of the float cooperates with the inside surface of the tank wall to define an annular column of dormant water. The degree of effectiveness of the float in preventing air from getting under the float at the periphery is determined by the dimensions of the annulus. The narrower the annulus, the greater the effectiveness; the deeper the annulus, the greater the effectiveness.

The width of the annulus is determined by the diameter of the float relative to the inside diameter of the tank for which it is intended. The depth of the annulus is determined by the density of the float material and the vertical dimension of the outside edge of the float.

The preferred form of such an air-water separating float, as illustrated in the patent in suit, consists of a flat disk-shaped central web of expanded polystyrene which is about one-quarter of an inch thick. Around this web is a peripheral flange which has a vertical thickness of about one inch. The float has a density of about ten pounds per cubic foot. The density of the float and the shape of the float are coordinated to assure that the lower face of the float is always in the water while the upper face is always above the water. In this way no air is captured beneath the float and no water rests on top of the float.

At several places around the float at the connection of the central web with the peripheral flange are small vertical holes about a quarter of an inch in diameter. The purpose of these holes is to permit any water which might collect on top of the float to drain down into the water below the float. The holes also serve to permit any air which might collect beneath the float to rise into the air head over the float. The amount of air absorption that takes place through these holes is so small that it does not materially affect the operation of the float as an air-water separating device.

In the center of the float described in the patent in suit is a larger hole, approximately one inch in diameter. Around this hole is a raised flange with a height of about one inch. The purpose of this large hole is to prevent the breaking or crushing of the float if for some reason the water level in the tank were to increase unchecked and carry the float up into the top of the tank. If such a situation were to occur, water could flow through this larger hole up over the float and thus prevent the float from being crushed into the rounded head of the tank. In practice plaintiff has discovered that this precaution is not necessary. The floats which it sells today do not have this hole, but they retain the raised flange area which surrounded this hole.

Such a float must be constructed from an air- and water-impervious material. This material must be light, rigid, shape-retaining and inert to chemicals in the water. It must not inject taste or odor to the water. The patent in suit recommends a closed-cell plastic material, such as expanded polystyrene.

Defendant has attacked all the claims of the patent in suit as invalid, claiming that the float described in the patent in suit, both separately and when combined

with a hydropneumatic tank or a water supply system, does not satisfy the statutory standards of patentability.

██ The statutory presumption of validity (35 U.S.C. § 282) imposes upon defendant the burden of proving the invalidity of the patent in suit by clear and convincing evidence. However, where relevant prior art has not been cited to the patent office, this statutory presumption of validity is either weakened or destroyed. See, e. g., Strzalkowski v. Beltone Electronics Corp., 371 F.2d 237, 240 (7th Cir. 1966); T. P. Labs., Inc. v. Huge, 371 F.2d 231, 234 (7th Cir. 1966); Milton Mfg. Co. v. Potter-Weil Corp., 327 F.2d 437, 439 (7th Cir. 1964); Technicon Instruments Corp. v. Coleman Instruments, Inc., 255 F.Supp. 630, 640 (N.D.Ill.1966).

Defendant contends that the patent in suit fails to satisfy the standards set forth in 35 U.S.C. § 103:

"A patent may not be obtained though the invention is not identically disclosed or described .as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which such subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

██ In applying this statutory test we must first determine what prior art should be considered. We may consider all prior art in the field of liquid supply pumping systems and also all prior art in analogous fields. Analogous fields include all areas to which the inventor might naturally have looked for help in solving the problem with which he was faced. In the present case the problem was waterlogging or, in more general terms, the absorption by water of air which is needed for the effective operation of a hydropneumatic tank. It is reasonable that an inventor faced with such a problem would consider all devices which are similarly intended to separate a liquid from a gas in situations in which absorption of the gas by the liquid would be undesirable. By this standard, all the items of prior art cited in this opinion and order constitute relevant prior art.

██ Given the relevant prior art as it stood at the time the patent in suit was applied for, we must then ask whether one having ordinary skill in the art would find the invention obvious. It is irrelevant that the inventor actually may not have been aware of some of the prior art. The proper way to deal with the prior art under section 103 is set forth in Application of Winslow, 365 F.2d 1017, 1020 (C.C.P.A.1966): "We think the proper way to apply the 103 obviousness test to a case like this is to first picture the inventor as working in his shop with the prior art references—which he is presumed to know—hanging on the walls around him." In applying this test, courts must guard against the exercise of hindsight in assessing the obviousness of a given improvement in the art and at the same time must strictly observe the statutory standards of patentability.

Claims 1 to 10 of the patent in suit contain as an element a conventional liquid supply pumping system. Claims 15, 16, 18, and 19 of the patent in suit contain as an element a conventional hydropneumatic tank assembly. Liquid pumping supply systems containing hydropneumatic tanks were well known to the water supply art prior to 1950. For example, Defendant's Exhibit 35, a Baker Manufacturing Company 1939 sales catalog, indicates that such systems were offered for sale many years prior to the application for the patent in suit. No aspect of the liquid pumping supply system described in Claims 1 to 10 or of the hydropneumatic tank assembly described in Claims 15, 16, 18, and 19 is a new element which lends patentability to these claims. All aspects of such systems are shown or suggested by the Baker Manufacturing 1939 sales catalog. The question then becomes whether in-

corporating an air-water separating float in such a system lends patentability to the claims.

The idea of using a rigid air-water separating float in a hydropneumatic tank to prevent waterlogging was a good idea. The domestic water supply industry was ready for such a device. However, "scores of progressive ideas in business are not patentable, and we conclude * * * that this one was not." Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp., 340 U.S. 147, 153, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950).

The following prior art patents disclose floats used to separate water from air or other liquids from other gases: Harris Patent No. 411,192, Gould Patent No. 1,116,414, Fee Patent No. 1,938,956, Peters Patent No. 1,959,640, and Nielebock Patent No. 2,317,796. All of these patents except Fee show rigid floats. The Harris and Nielebock patents were not cited to the patent examiner.

Plaintiff relies heavily on the design of his particular float to achieve patentability. In particular, he points to the flange which produces an annular column of dormant water between the edge of the float and the inside wall of the hydropneumatic tank. However, the use of a flange on a float to produce such a dormant column of water is illustrated in both Peters and Nielebock. In both these patents, the narrow annular column of water was utilized to limit to the greatest extent possible the gradual absorption of air by water.

■ The choice by Taylor of expanded polystyrene as the material from which to construct this air-water separating float is not a patentable concept. The selection of one known material available to the artisan over another for its obvious properties and characteristics does not constitute invention. Expanded polystyrene became widely available commercially and its properties became widely known only shortly prior to the application for the patent in suit. The choice of a plastic and, in particular, expanded polystyrene, as the material for his float was obvious to a person in Mr. Taylor's position. Since no specific materials are listed for constructing floats in prior patents such as Gould, it is natural to assume that the most advantageous materials available at the time the device is constructed would be used.

Hoffman Patent No. 2,660,194 illustrates a use of expanded polystyrene which is analogous to the use plaintiff made of this material in constructing its float. The Hoffman patent clearly suggests the use of a plastic material having closed discrete cells for making floats. No new and unobvious results flow from the use of expanded polystyrene in the float in the patent in suit.

It also required only limited mechanical skill to devise a means such as small holes for permitting water to drain off the top of a float. Likewise the use of holes to permit air to escape from underneath a float is rather obvious. The use of the larger hole in the center of the float of the patent in suit, or other means to prevent the float from being crushed against the head of the tank, would also be readily apparent to one skilled in the art. No skill greater than that of the ordinary mechanic was needed to devise or insert the holes in the float in the patent in suit.

■ If, at the time of Taylor's invention, a mechanic with ordinary skill in the art of water supply systems had worked on the problem of preventing waterlogging in a hydropneumatic tank, and in particular the problem of preventing the absorption of air in the tank by the water in the tank, and if he had been faced with the Harris, Gould, Fee, Nielebock, and Peters patents illustrating various types of floats, some of which had flanges, and if he had been aware of the properties of expanded polystyrene and acquainted with the use of such a material in the Hoffman patent, then it would have been obvious to him that a rigid air-water separating float similar to the float devised by Mr. Taylor and illustrated in the patent in suit would solve the problem substantially. Therefore, the court concludes that

Claims 1 through 16 and 18 and 19 of the patent in suit are not valid. The devices described in these claims would have been obvious in 1959 (or even 1956) to a person skilled in the art of water supply systems for domestic use and acquainted with the patents cited in this opinion.

The patent in suit was issued on April 24, 1962, after a prosecution which took five and one-half years and involved over 400 pages of written material. In the course of the prosecution there were twelve rejections by the patent office, seventeen amendments by the applicant, and six personal interviews in Washington, D. C., between the applicant, his attorneys, and the various patent office examiners involved. During the course of the application for this patent, apparently the Nielebock and Harris patents never came to the attention of the patent office. The evidence shows that the Harris patent was known to plaintiff and its attorneys during the time that they were seeking the patent in suit. The patent examiner did not have before him two highly pertinent references on a subject which bothered him. It is doubtful whether the examiner would have allowed the claims of the patent in suit had he been aware of both Harris and Nielebock. In any case, the presumption of patentability normally attached to the issuance of the patent by the patent office has been severely weakened or does not lie at all as against the Harris and Nielebock patents. See page 8 supra.

■ Plaintiff has argued that the following factors indicate that the Taylor float is a patentable device: (1) the immediate and substantial commercial success of the float described in the patent in suit; (2) the fact that the float satisfied a long felt but unsolved need in the domestic water supply system industry; (3) the failure of others to devise a commercially feasible air-water separating float; and (4) imitation of the Taylor float by its competitors, including this defendant. Since the court has concluded that the claims of the patent in suit are invalid for the reasons heretofore stated, it is not necessary to discuss these four secondary indicia of patentability. When a device such as this one is clearly not patentable, factors such as commercial success, copying, and claimed satisfaction of a long felt need cannot supply patentability.

However, this court has not been unaware of these four factors. It has considered them in its effort to prevent utilizing hindsight in analyzing the obviousness of the device described in the patent in suit.

■ Plaintiff's contention that defendant's segmented and radially-ribbed fluted floats infringe various claims of the patent in suit must be denied. An invalid patent cannot be infringed. However, the remainder of this opinion and order will deal with the infringement issues in this case as if the claims of the patent in suit were valid.

In 1960, defendant became aware of plaintiff's float and tank assembly and recognized the effectiveness of using such an air-water separating float to prevent waterlogging. However, it appeared that plaintiff's float would have limited value since (1) it could not be placed inside a galvanized tank, and (2) it could not be placed inside a tank after its manufacture. Defendant tried to develop a rigid air-water separating float which could be inserted into a tank after its manufacture through a tap hole in the tank. Defendant was successful in this effort and produced its so-called segmented float.

This float consists of numerous parallel bars of expanded polystyrene, each bar being about one inch thick and one inch wide. The bars of each float are of different lengths so that when assembled they form a circular float. By the use of strings and springs, this float can be placed inside an assembled hydropneumatic tank. The springs are inserted into the tank first, and then the polystyrene bars are inserted one at a time. By means of simple manipulation of the guide strings, the bars fall into the form of a circular float within the hydropneumatic tank. The springs are then used to provide sufficient tension to keep the

bars in the form of a rigid circular float. The assembled float thus resembles a flat, one inch thick disk of expanded polystyrene. This segmented float was first placed on the market in October 1960.

In 1965 defendant started manufacturing and selling a rigid one piece float. This float is known as a radially-ribbed fluted float. This float consists of a single piece of expanded polystyrene which, depending upon the diameter of the float, is about three-quarters of an inch to one inch thick. Along each face of the float are a series of flutes or grooves leading from the center of the float to the periphery. Between these radial flutes are a series of pie-shaped, radial ridges or ribs. Both faces of this float are identical. This float is designed to be placed inside a hydropneumatic tank during manufacture. The purpose of the radial ridges and grooves on the faces of the float is to permit water which accumulates on top of the float to drain from the center of the float outwardly to the side. The ridges and grooves on the lower face of the float permit any air which accumulates beneath the float to flow toward the outer edge of the float and hence upward into the air head above the float. The float normally rests with its lower face entirely submerged in water. The density of both the defendant's floats is comparable to that of the plaintiff's float.

This radially-ribbed fluted float does not have a flange around its peripheral edge. There is no raised portion resembling a collar or flange around the periphery of the Baker radially-ribbed fluted float. This float is substantially as thick at its perimeter as it is at all points in the interior. In fact, instead of having a raised peripheral flange, this float becomes slightly thicker as one moves from the edge to the center.

Defendant's float produces a narrow annular column of water along its periphery because the float itself, without a flange, is thick enough to produce such a column of water. Plaintiff's float, on the other hand, requires a raised flange or outside edge in order to produce this column of dormant water.

The patent in suit has been carefully written and the words used in the claims are the result of extensive dealings with various patent examiners. As to each claim of a patent nothing can be held to be an infringement which does not fall within the terms the patentee has chosen to express his invention. In this case, plaintiff chose to describe a preferred embodiment of his invention in terms of a peripheral flange. This court will not rewrite Claims 4, 5, 6, 11, 12, 13, 14, and 16 of the patent in suit to strike all language referring to a peripheral flange. The absence of any flange prevents defendant's radially-ribbed fluted float from infringing Claims 4, 5, 6, 11, 12, 13, 14, and 16 of the patent in suit.

Defendant's radially-ribbed fluted float is a solid disk of expanded polystyrene. It has no holes of any kind going through its surface and therefore defendant's radially-ribbed fluted float does not infringe Claims 5, 6, 12, or 14 of the patent in suit. These claims contain as an element holes to permit the passage of water and air through the float. The fact that the grooves on the faces of defendant's radially-ribbed fluted float serve the same purpose of conveying air and water from one side of the float to the other does not mean that there is infringement. The way in which defendant accomplishes this result is substantially different from the way in which this result is achieved by plaintiff's device.

As to those claims (1, 2, 3, 7, 8, 9, 10, 15, 18, and 19) of the patent in suit which do not contain as an element either a flange or holes, the court finds that the accused floats do infringe the Taylor patent. More particularly, this court finds that the sale by defendant of pressure tanks containing its segmented float constitutes a direct infringement of Claims 15, 18, and 19 of the patent in suit. Likewise the sale by defendant of tanks containing its fluted float directly infringes Claims 15,

18, and 19. This court also concludes that because of its sale of pressure tanks containing its radially-ribbed fluted float, defendant is a contributory infringer and has induced infringement of Claims 1, 2, 3, 7, 8, 9, and 10 of the patent in suit. These findings of infringement are made because the accused devices do the same work in substantially the same way and accomplish the same result as the devices described in Claims 1, 2, 3, 7, 8, 9, 10, 15, 18, and 19 of the patent in suit.

Because this court holds that none of the claims of the patent in suit which are involved in this case is a valid claim, it is ordered that the Clerk enter judgment dismissing this action. The Clerk shall tax costs against the plaintiff pursuant to Rule 54 of the Federal Rules of Civil Procedure. This is not an exceptional case which justifies awarding attorney's fees pursuant to 35 U.S.C. § 285.