641 F.2d 298
 209 U.S.P.Q. 545
 I. U. TECHNOLOGY CORPORATION, Plaintiff-Appellant-Cross-Appellee,
v.
RESEARCH-COTTRELL, INC., Texas Utilities Generating Company
and Texas Utilities Services, Inc.,
Defendants-Appellees-Cross-Appellants.
 No. 79-1158.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit A
 April 2, 1981.
 Arnold, White & Durkee, Tom Arnold, Bill Durkee, Houston, Tex., Baker, Glast, Riddle, Tuttle & Elliott, W. Randolph Elliott, Dallas, Tex., Miller & Prestia, Paul F. Prestia, Havarford, Pa., for plaintiff-appellant-cross-appellee.
 Richards, Harris & Medlock, V. Bryan Medlock, Jr., Garland P. Andrews, Worsham, Forsythe & Sampels, G. Roland Love, Dallas, Tex., for defendants-appellees-cross-appellants.
 Appeals From the United States District Court for the Northern District of Texas.
 Before GOLDBERG, POLITZ and SAM D. JOHNSON, Circuit Judges.
 POLITZ, Circuit Judge:
 
 
 1
 In this patent suit I.U. Technology Corporation (IUT) seeks a declaration that Research-Cottrell et al., are infringing and will further infringe U.S. Patent No. 3,785,840 ('840 patent) involving "Lime-Fly Ash-Sulfite Mixtures." Defendants counterclaim for a declaratory judgment that the '840 patent is invalid. The case was tried to a jury which returned six special verdicts: (1) defendants' operations at an existing plant have infringed the patent, (2) defendants' intended operation at another plant will infringe the patent, (3) the invention claimed by the patent was not new, (4) the invention was obvious, (5) the patent fails to point out and distinctly claim the invention, and (6) the patent has been misused. The court entered judgment consistent with the special verdicts, concluding that the patent is invalid under 35 U.S.C. § 102 (novelty), § 103 (obviousness) and § 112 (indefiniteness), unenforceable because of misuse, and infringed by defendants' activities with respect to Claims 3 and 5.[1] The court denied reciprocal motions for judgment n. o. v. We affirm the judgment declaring the patent invalid and vacate the judgment insofar as it relates to infringement.[2]
 
 I. The Problem
 
 2
 Congress enacted the Clean Air Act, 42 U.S.C. §§ 7401 et seq., in its efforts toward ecological enhancement of the ambient air. Strict controls were imposed on various entities and activities, notably including coal burning electric power companies. A consequence of the application of the Clean Air Act to those utilities provides the genesis of this patent litigation.
 
 
 3
 Charged with enforcement of the Clean Air Act, the Environmental Protection Agency focused much of its attention on what was considered to be a primary source of air pollution: flue gases from combustion equipment used in coal burning power generating plants. It was required, inter alia, that two components of the flue gases, fly ash and sulfur oxides, be removed. The first component, fly ash, is a finely divided particulate material which typically is removed by electrostatic precipitators. This fly ash, having the physical properties of a solid yet fluid-like dust or powder, had less than a 10% utility as recently as 1977, a year in which an estimated 45 million tons was produced as a by-product of generating electricity. Fly ash could be and was used in negligible amounts in combination with lime to produce a cementitious composition. It was not competitive, however, with the traditional form of cement, popularly known as portland cement, in part because it required a substantially longer setting up or hardening period.
 
 
 4
 The second environmentally undesirable component of flue gases, sulfur oxides (SO 2 and SO 3), are removable by a process known as "wet scrubbing." The technique involves scrubbing the combustion equipment flue gases with water and either the hydrate or carbonate form of an alkaline earth metal. In the more advanced desulfurization processes in use today, either hydrated lime (Ca(OH) 2), pulverized limestone (CaCO 3), or magnesium oxide or hydroxide (MgO or Mg(OH) 2) is employed as the reacting chemical agent. In each case the liming agent is fed through the boiler gas scrubbing operation as a slurry, capturing the sulfur oxides from the boiler gases and converting them primarily to calcium sulfite hydrate.
 
 
 5
 Wet scrubbers, although effective in eliminating atmospheric pollution caused by the release of sulfur oxides, generate a waste by-product referred to as sludge. The magnitude of the sludge disposal debacle facing power companies in 1974 was reflected by one company's estimate that over 70 million tons of the waste material would be produced in 1980. The virtual non-utility of sludge is primarily a result of its thixotropic propensity, i. e., it returns to a fluid state upon agitation. In its initial form sludge is approximately 9% solid, generally comprised of calcium sulfite. In addition it contains some fly ash not removed by the electrostatic precipitators, small quantities of calcium sulfate caused by oxidation (calcium sulfite (CaSO 3) k oxygen (O) = CaSO 4), and excess liming agent.
 
 
 6
 For years the efforts to dispose of fly ash were limited to collecting it into large ponds or mounds in immediate proximity to the power plant. Initial disposal efforts of scrubber sludge were similarly limited to pumping the waste into large ponds. This method merely substituted one form of pollution for another, however, because the scrubber liquid in the ponds frequently percolated into underlying aquifers or overflowed into surface waters. In addition, vast amounts of valuable acreage were diverted to disposal sites and thus removed from productive use.
 
 II. The Solution
 
 7
 The urgency of developing a method of disposing of fly ash and scrubber sludge in an environmentally acceptable, economical and productive manner was universal and pervasive. Millions of dollars were expended by the government and the private sector in pursuit of a solution. One group of research chemists headed by Dr. Leonard John Minnick made significant progress in January 1971.[3] Their research ultimately led to the issuance of the '840 patent on January 15, 1974.
 
 
 8
 As set forth in footnote one, supra, Dr. Minnick's '840 patent claims a cementitious structural composition which is a water suspension comprising stated percentages of three ingredients: an alkaline earth metal hydroxide, e. g., calcium hydroxide (Ca(OH) 2) or magnesium hydroxide (Mg(OH) 2); an alkaline earth metal sulfite, e. g., calcium sulfite (CaSO 3); and fly ash. Simply stated, the patent teaches an environmentally acceptable method for stabilizing scrubber sludge and fly ash to make a cementitious material, i. e., one which will harden permanently so as not to reslurry when subjected to water and/or agitation and which is appropriate for land fill, embankment, road base and certain aggregate uses such as bricks.
 
 III. The Actors
 
 9
 At the time of their research Dr. Minnick and his co-developers of the '840 patent were employees of the G. & W. H. Corson Company (Corson), a regional lime manufacturing and sales company in Pennsylvania. The patent was issued to Corson. In 1972 Corson became a subsidiary of IU International Corp. (International), and later assigned the '840 patent to another subsidiary of International, IU Conversion Systems (IUCS). On January 1, 1975, IUCS assigned the patent to still another International subsidiary, IUT, a patent research, development and holding company. IUT in turn granted a nonexclusive license to IUCS to practice the invention of the '840 patent.
 
 
 10
 Defendant Research-Cottrell is a major manufacturer of electrostatic precipitators and flue gas scrubbers. It contracted with defendant Texas Utilities Service, Inc. (TUSI), a sister subsidiary of defendant Texas Utilities Generating Company (TUGCO), to design, build and operate a pilot plant at TUGCO's Big Brown Station in Fairfield County, Texas. The contract was entered into with a view toward later designing and building scrubber and waste disposal facilities at the Martin Lake Station being operated by TUGCO in Rusk County, Texas. Research-Cottrell agreed to indemnify TUSI and TUGCO against certain liabilities incurred in connection with charges of patent infringement, including that brought by IUT under the '840 patent. By August 1974 the pilot plant at TUGCO's Big Brown Station was operational. At the time of trial the Martin Lake Station was not yet in operation. IUT's complaint sought a declaratory judgment that operation of the Big Brown Station was an existing infringement and that the Martin Lake Station would be an infringement when put into operation.
 
 IV. Validity
 
 11
 When faced with dual issues of validity and infringement, this court has recognized the public importance of first addressing the former and not conveniently disposing of an appeal by only deciding the latter. See Continental Oil Co. v. Cole, 634 F.2d 188 (5th Cir. 1981), citing Sinclair Co. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945); Beckman Instruments, Inc. v. Chemtronics, Inc., 428 F.2d 555 (5th Cir.), cert. denied, 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264 (1970). The vibrancy of that position continues today with equal compulsion.
 
 
 12
 As noted earlier, the '840 patent was adjudged invalid on several grounds: (1) it was anticipated by the prior art, i. e., the invention was not novel as required by 35 U.S.C. § 102; (2) the subject matter as a whole was obvious to a person of ordinary skill in the art a question of inventiveness under 35 U.S.C. § 103; and (3) the patent claims failed to particularly point out and distinctly claim the subject matter of the invention as required by 35 U.S.C. § 112. Further, the patent was found to have been misused. Because of our disposition of the obviousness issue, it is unnecessary to review the alternate issues raised by IUT in its appeal.[4]
 
 
 13
 On numerous occasions we have enunciated the precepts of obviousness.[5] For that reason we note only the analytical framework necessary for this case. 35 U.S.C. § 103 provides in part:
 
 
 14
 A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.
 
 
 15
 Obviousness is a question of law that "necessarily entails several basic factual inquiries." Sakraida v. Ag Pro, Inc., 425 U.S. 273, 280, 96 S.Ct. 1532, 1536, 47 L.Ed.2d 784 (1976); Yoder Bros., Inc. v. California-Florida Plant Corp., 537 F.2d 1347, 1379 (5th Cir. 1976), cert. denied, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977). In the seminal case of Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966), the Supreme Court announced the mandatory[6] tripartite elements comprising these factual inquiries:
 
 
 16
 Under § 103, the scope and content of the prior art are to be determined; difference between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.
 
 
 17
 See also Continental Oil Co. v. Cole, supra; John Zink Co. v. National Airoil Burner Co., 613 F.2d 547 (5th Cir. 1980). We are constrained by the limitations of Rule 52(a), Fed.R.Civ.P., in our review of the factual findings on these three inquiries. Bird Provision Co. v. Owens Country Sausage, Inc., 568 F.2d 369, 372 (5th Cir. 1978) ("because patent cases so frequently involve conflicts in the evidence, especially in expert testimony, they seem particularly suited for the review limitations imposed by Rule 52(a)"); Parker v. Motorola, Inc., 524 F.2d 518 (5th Cir. 1975), cert. denied, 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976).
 
 
 18
 A. Pertinent Art: Waste Disposal versus Cement Chemistry
 
 
 19
 IUT and Research-Cottrell agree on little if anything that might be helpful in resolving the aforementioned factual inquiries. Strong differences exist as to what the scope and content of the prior art are, which in turn bear directly on ascertaining differences between the prior art and the claims of the '840 patent. Perhaps the most significant disagreement, however, one which is crucial to a correct analysis of the first two inquiries, is what is the "pertinent" art against which the obviousness vel non of the '840 patent is to be tested.
 
 
 20
 At least in words we find a general agreement between the parties that the pertinent art is that in which the "problem solvers" were engaged. This, however, merely posits the question; the dispute continues unabated as to the identity of the problem solvers. IUT forcefully argues that the art to which the subject matter of the '840 patent pertains is the art of scrubber sludge waste disposal. Research-Cottrell, on the other hand, counters which equal intensity that the problem solvers, Dr. Minnick et al., were engaged in and applied the technology of cement chemistry. The trial judge concluded that "cement chemistry was the most pertinent art and the field of art to which the patent pertains." He further noted that "even if it be assumed that the field of art in issue in this case is that of scrubber sludge disposal, the art of cement chemistry was shown to be so closely related and similar (that it would) appeal to one skilled in the art of scrubber sludge disposal (seeking) a solution to the problem." We agree in both respects.1. Cement Chemistry as the Most Pertinent Art
 
 
 21
 Section 103 requires that the obviousness of a patented invention be tested in the light of that mythical person who possesses ordinary skill in the art to which the subject matter pertains. As succinctly stated by one court:
 
 
 22
 (This hypothetical person is) charged with knowledge of all that the prior art disclosed at the time of his alleged invention, irrespective of whether persons of ordinary skill in the field, or he himself, or anyone else, actually possessed such all-encompassing familiarity with prior disclosures.
 
 
 23
 Walker v. General Motors Corporation, 362 F.2d 56, 60 n.3 (9th Cir. 1966), citing Graham v. John Deere Co., supra. See also Steelcase, Inc. v. Delwood Furniture Co., Inc., 578 F.2d 74, 79 (5th Cir. 1978) ("This hypothetical person of ordinary skill is not deemed to be omniscient, but he must be assumed to share the knowledge available in his art (to persons of ordinary skill) wherever it may originate."). With uniformity the cases adhere to the view that it is the problem solver and not the user of the solution who must be the focus of inquiry. See Systematic Tool, Etc. v. Walter Kidde & Co., Inc., 555 F.2d 342, 349 (3d Cir.), cert. denied, 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 128 (1977) (patent for hand-operated tomato slicer; "(district) court ... looked to the knowledge of persons who perform the task of tomato slicing to determine skill in the pertinent art. By focusing on the user rather than the problem solver, the district court erred."); Universal Athletic Sales Co. v. American Gym, Etc., 546 F.2d 530 (3d Cir. 1976), cert. denied, 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977) (patent for weight-lifting apparatus; pertinent art was design of body-training devices, not weight-training or mechanical engineering); Howe v. General Motors Corporation, 401 F.2d 73, 78 (7th Cir. 1968), cert. denied, 394 U.S. 919, 89 S.Ct. 1192, 22 L.Ed.2d 452 (1969) ("the level of ordinary skill in the field of designing automobile bodies, including hinges, was that of engineers of substantial training, and specialized skill"); Gass v. Montgomery Ward & Co., 387 F.2d 129, 132 (7th Cir. 1967) ("The level of ordinary skill in the field appears to be that of mechanically inclined men with long experience in design of auto accessories."); In re Grout, 377 F.2d 1019, 1022 (CCPA 1967) ("Appellant's invention relates to novel fastening means used in beehives. It is alleged that a problem existed in the support of honeycomb foundations which appellant solved. While this problem would be encountered by a beekeeper, we think the problem naturally calls for the talents of one skilled in the art of fasteners. Under section 103 we must look to the person of ordinary skill in the art to which the invention pertains, not those who may use the invention."); In re Laverne, 356 F.2d 1003, 1005-06 (CCPA 1966) (patent for molded chair; "Since those who create designs are designers, not chair makers, it would seem to follow that he is operating in the field of industrial design and that it is the 'art' involved.").
 
 
 24
 In the present case the "users" of Dr. Minnick's patented '840 formula unquestionably include those in the field of scrubber sludge waste disposal. The "problem solvers," however, were practicing in the field of cement chemistry at the time of the invention. Accordingly, cement chemistry is the most pertinent art. Support for this conclusion is twofold. First, there is substantial evidence in the record that Dr. Minnick's background approached, if not equalled, that of an expert in the field of cement chemistry. He had done research at Corson with portland cement during the 1950's, and had served as chairman of three committees with ties to the cement industry. Furthermore, Dr. Minnick had obtained between 25-30 patents in the area of fly ash and lime, both relevant elements in cement chemistry. During his more than 35 years with Corson, Dr. Minnick had conducted or supervised considerable research in the development of new and improved uses of lime, also of key importance to the cement industry. Second, we take note that the claims of the '840 patent teach the mixture for a cementitious product, not a solution to the problem of sludge disposal. The polestar position accorded the claims of a patent in determining scope of protection from infringement, see, e. g., McClain v. Ortmayer, 141 U.S. 419, 12 S.Ct. 76, 35 L.Ed. 800 (1891); Weidman Metal Masters v. Glass Master Corp., 623 F.2d 1024 (5th Cir. 1980); Studiengesellschaft Kohle v. Eastman Kodak Co., 616 F.2d 1315 (5th Cir.), cert. denied, --- U.S. ----, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980), is no less warranted when ascertaining the pertinent art as it relates to invalidity for obviousness. That analogy flows from our reading of cases under 35 U.S.C. § 112, regarding invalidity for indefiniteness, which make abundantly clear that patent claims are addressed to those skilled in the art. See Studiengesellschaft, supra; Standard Coil Products Co. v. General Electric Company, 306 F.2d 319 (2d Cir. 1962); Jones Knitting Corporation v. Morgan, 361 F.2d 451 (3d Cir. 1966); Briggs v. M & J Diesel Locomotive Filter Corp., 342 F.2d 573 (7th Cir. 1965), cert. denied, 382 U.S. 801, 86 S.Ct. 11, 15 L.Ed.2d 55 (1966); Popeil Brothers, Inc. v. Schick Electric, Inc., 356 F.Supp. 240 (N.D.Ill.1972), aff'd, 494 F.2d 162 (7th Cir. 1974). We perceive no logical bar to the adaptation of that language to the instant suit where the pertinent art must be ascertained under 35 U.S.C. § 103. The trial judge correctly concluded that cement chemistry is the most pertinent art.
 
 2. Cement Chemistry as an Analogous Art
 
 25
 Notwithstanding our conclusion in Part 1, supra, we agree with the district court that at the very least the art of cement chemistry is an analogous art to the field of scrubber sludge waste disposal. That analogous arts are to be included within the meaning of "prior art" was recently reaffirmed in Cathodic Protection Service v. Am. Smelting, Etc., 594 F.2d 499, 507 (5th Cir.), cert. denied, 444 U.S. 965, 100 S.Ct. 453, 62 L.Ed.2d 378 (1979):
 
 
 26
 The prior art that must be considered includes not only all prior art in the field of cathodic protection, but also all prior art in analogous fields. See Mandel Bros. v. Wallace, 335 U.S. 291, 69 S.Ct. 73, 93 L.Ed. 12 (1948) ((use of urea as a corrosion inhibitor in antiperspirants held not to be an invention because in the chemical field urea was known to be a corrosion inhibitor)); Gerner v. Moog Industries, Inc., 383 F.2d 56 (8th Cir. 1967), cert. denied, 390 U.S. 922, 88 S.Ct. 855, 19 L.Ed.2d 981 (1968).
 
 
 27
 In Cathodic we quoted with approval (594 F.2d at 508) the following language of our colleagues in the Eighth Circuit in Skee-Trainer, Inc. v. Garelick Mfg. Co., 361 F.2d 895, 898 (8th Cir. 1966):
 
 
 28
 "prior art" may include not only earlier devices and publications but also similar devices whether or not in related areas to the patented device and with respect to a simple mechanical device utilizing universally known principles permits referring to the field of mechanics itself.
 
 
 29
 See also Aerotec Industries of Calif. v. Pacific Scientific Company, 381 F.2d 795 (9th Cir. 1967), cert. denied, 389 U.S. 1049, 88 S.Ct. 788, 19 L.Ed.2d 843 (1968) (trolley catchers were analogous prior art to patent for inertia-operated safety apparatus for occupants of rapid moving aircraft and automobiles); Stearns v. Tinker & Rasor, 220 F.2d 49, 56-57 (9th Cir.), cert. denied, 350 U.S. 830, 76 S.Ct. 62, 100 L.Ed. 741 (1955) ("if the elements and purposes in one art are related and similar to those in another art, and because and by reason of that relation and similarity make an appeal to the mind of a person having mechanical skill and knowledge of the purposes of the other art, then such arts must be said to be analogous"); Mott Corporation v. Sunflower Industries, Inc., 314 F.2d 872 (10th Cir. 1963); Application of Wood, 599 F.2d 1032, 1036 (CCPA 1979) ("The determination that a reference is from a nonanalogous art is ... two-fold. First, we decide if the reference is within the field of the inventor's endeavor. If it is not, we proceed to determine whether the reference is reasonably pertinent to the particular problem with which the inventor was involved."); Application of Shapleigh, 248 F.2d 96, 102 (CCPA 1957) ("test ... is whether one seeking to solve a problem with respect to the embodiment of a reference in one art would be apt to seek the solution to said problem in the other art"); General Motors Corp. v. Toyota Motor Co., Ltd., 467 F.Supp. 1142 (S.D.Ohio 1979); Metal Coating Corp. v. Baker Manufacturing Co., 277 F.Supp. 403 (W.D.Wis.1967); Endevco Corporation v. Chicago Dynamic Industries, Inc., 268 F.Supp. 640 (N.D.Ill.1967); Canadian Ingersoll-Rand Co. v. Peterson Prod. of San Mateo, 223 F.Supp. 803 (N.D.Cal.1963), aff'd in pertinent part, 350 F.2d 18 (9th Cir. 1965).
 
 
 30
 Application of references from analogous arts to resolve the question of obviousness under 35 U.S.C. § 103 is not without limitation. As the Court of Customs and Patent Appeals pointed out in Application of Wood, 599 F.2d at 1036:
 
 
 31
 (W)e presume full knowledge by the inventor of all the prior art in the field of his endeavor. However, with regard to prior art outside the field of his endeavor, we only presume knowledge from those arts reasonably pertinent to the particular problem with which the inventor was involved. In re Antle, 444 F.2d 1168, 1171-72, 58 CCPA 1382, 1387, 170 USPQ 285, 287-88 (1971). The rationale behind this rule precluding rejections based on combination of teachings of references from nonanalogous arts is the realization that an inventor could not possibly be aware of every teaching in every art. Thus, we attempt to more closely approximate the reality of the circumstances surrounding the making of an invention by only presuming knowledge by the inventor of prior art in the field of his endeavor and in analogous arts.
 
 
 32
 In the case at bar the trial judge was confronted with conflicting expert testimony and he opted to credit the testimony of Research-Cottrell's expert witnesses, Drs. Copeland and Daugherty, that one seeking a solution to the sludge disposal problem would look to the art of cement chemistry.[7] Dr. Minnick's action in sending samples of the substance produced by the experiments in 1971 to Rutger's University Ceramics Department is reflective of the pertinency of the cement chemistry discipline. Dr. Minnick believed "that (was) a natural place to go." Furthermore, the record is replete with evidence that much of the effort directed toward the disposal of fly ash and scrubber sludge was aimed at stabilizing the waste in a cementitious composition. In light of the totality of the evidence we are persuaded that the trial judge's finding that cement chemistry is an analogous art, if not the most pertinent art, is not clearly erroneous.
 
 B. Level of Ordinary Skill
 
 33
 In partial adherence to the third Graham inquiry, we have concluded that the pertinent art is that of cement chemistry. We now consider the remainder of the inquiry which speaks to the "level of ordinary skill" in that art.
 
 
 34
 IUT contends that Drs. Copeland and Daugherty, who testified for Research-Cottrell, were "super-experts; not § 103's 'ordinary men.' " Assuming per arguendo that Copeland and Daugherty were the two leading cement chemists in this country as IUT suggests, the trial judge was obviously convinced, after reviewing all of the evidence, that the subject matter of the '840 patent would have been obvious to one of ordinary skill in the art of cement chemistry. We are persuaded that this determination of the level of skill was not made up out of whole cloth but was the product of a host of questions raised and answered at trial, all of which the trial judge assimilated before reaching his decision. Included were questions such as: At the time of the claimed invention in 1971, who were the people actively engaged in the field of cement chemistry? What were their educational backgrounds? How much and what sort of experience had they had in the field? How often had they met with success in tackling similar problems? See Systematic Tool, Etc. v. Walter Kidde & Co., Inc., 555 F.2d 342, 350 (3d Cir.), cert. denied, 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 128 (1977) (Rosenn, J., dissenting), citing Jacobson Brothers, Inc. v. United States, 512 F.2d 1065 (Ct.Cl.1975); Columbia Broadcasting Sys. v. Sylvania Electric Prod., Inc., 415 F.2d 719 (1st Cir. 1969), cert. denied, 396 U.S. 1061, 90 S.Ct. 755, 24 L.Ed.2d 755 (1970). It cannot be gainsaid that the trial judge's findings on the pertinent level of ordinary skill are not clearly erroneous. As such we are bound to accept them.
 
 C. The Prior Art
 
 35
 The prior art references upon which Research-Cottrell principally rely and which were noted by the trial court fall into three categories. First, there is Japanese Patent No. 348,326 issued to Murakami in 1959. As noted by the trial court, "the Murakami patent ... taught that calcium sulfite can be produced in a scrubber system by using lime to collect the sulfur dioxide contained in gases from combustion equipment and it can then be an add-mixture during the manufacture of cement." After reviewing the Murakami patent Dr. Daugherty testified that "the calcium sulfite had a very similar reaction with respect to the setting of cement as calcium sulfate." He conceded, however, that it was questionable whether the Murakami patent by itself disclosed the subject matter of the '840 patent because the reference failed to mention fly ash. He nevertheless concluded that viewed in light of the general knowledge possessed by one of ordinary skill in the art of cement chemistry, the Murakami reference made obvious the '840 patent.
 
 
 36
 The prior art also includes a 1964 East German patent entitled "Method for Improvement of Cement or Mixture Containing Cement" and two articles by Murakami published in 1958 and 1959. The East German patent discloses that calcium sulfite will decrease the expansion of constituents in portland cement. Murakami's two articles likewise suggest that calcium sulfite can be added along with or as a substitute for calcium sulfate in a pozzolan system, a system identical to portland cement for purposes here pertinent.
 
 
 37
 Third, there are two 1960 publications: an article published by van Aardt and a Highway Research Board Bulletin. The van Aardt article discloses the effect of calcium aluminosulfite when calcium sulfite is added to a cement process. Calcium sulfite reacts with alumina in portland cement to form aluminosulfite which enhances stability and resistance of cement to prevent deleterious expansion of concrete. The Highway Research Bulletin discloses that sulfite added to lime-fly ash systems accelerates the strength and stabilizes the soils with which it is mixed.
 
 
 38
 IUT challenges these references on several grounds, none of which compels a contrary conclusion. One contention appears threaded through each IUT argument, viz, that the references became pertinent only from the vantage of the teachings of the '840 patent as is reflected by the long delay in solving the problem of scrubber sludge disposal.[8] It necessarily follows that in a suit to determine the validity of a patent one will always be required to examine the prior art with the knowledge of the patent under challenge. We have viewed the prior art fully conscious of the need to safeguard against the 20/20 visual acuity which abides in hindsight. See Erie Technological Prod., Inc. v. Die Craft Metal Prod., Inc., 461 F.2d 5 (7th Cir. 1972).
 
 
 39
 We conclude that the trial judge correctly considered the listed references as pertinent parts of the prior art against which the '840 patent had to be tested.
 
 
 40
 D. The Difference Between the Prior Art and the '840 Patent
 
 
 41
 The trial court found that in 1971 it would have been obvious to one of ordinary skill in the art of cement chemistry that the preparation of a mixture of lime, fly ash and calcium sulfite would form the cementitious composition claimed by the '840 patent. This conclusion was supported by prior art references indicating that one of ordinary skill in the art knew: (1) that lime and fly ash would react in the presence of water to form a rock-like material; (2) that calcium sulfate would beneficially accelerate the reaction between lime and fly ash; and (3) that calcium sulfate and calcium sulfite behaved similarly in a lime and fly ash mixture. Our review of the record does not reveal any difference between the prior art references and the '840 patent of sufficient consequence to warrant a conclusion other than that reached by the trial judge relative to obviousness.
 
 
 42
 For these reasons the decision of the district court that U.S. Patent No. 3,785,840 is invalid is AFFIRMED.
 
 
 
 [1]
 The teachings of the '840 patent are contained in the following six Claims:
 
 
 [1]
 The cementitious hardenable, structural mixture comprising a water suspension of 30 90 weight percent solids, said solids comprising 0.25 70 weight percent alkaline earth metal hydroxides, 10 99.5 weight percent fly ash and 0.25 70 weight percent alkaline earth metal sulfite
 
 
 [2]
 The cementitious mixture of claim 1, wherein said solids content is 30 60 weight percent of said suspension
 
 
 [3]
 The cementitious mixture of claim 1, wherein said solids content is 50 90 weight percent of said suspension
 
 
 [4]
 The cementitious mixture of claim 1, wherein said alkaline earth metal hydroxides consist essentially of calcium hydroxide
 
 
 [5]
 The cementitious mixture of claim 1, wherein said alkaline earth metal hydroxides consist essentially of calcium hydroxide and said alkaline earth metal sulfite consists essentially of calcium sulfite
 
 
 [6]
 Hardenable material consisting of the cementitious mixture of claim 1 admixed with aggregate
 IUT alleged infringement of Claims 1 and 4 as well as Claims 3 and 5. The trial judge correctly concluded that "if Claims 3 and 5 are adjudicated valid and infringed, Claims 1 and 4 are redundant; if Claims 3 and 5 are adjudicated invalid Claims 1 and 4 should go with them."
 
 
 [2]
 The finding of infringement is inconsistent with the declaration of patent invalidity. We recognize, however, that this dual finding was done in anticipation of appeal and in the interest of judicial economy. We commend the district judge and intend no criticism whatsoever in vacating that portion of the judgment relating to infringement
 
 
 [3]
 Although IUT has labeled January 1971 as "Eureka Day" insofar as a major breakthrough was achieved at that time, in fact Dr. Minnick did not then know what substance his experiments had produced. Samples were sent to the Ceramics Department of Rutgers University for analysis at which time the magnitude of the discovery was revealed. Thousands of sludge and fly ash tests were still to be performed, however, before a patent application was filed on June 5, 1972
 
 
 [4]
 See Waldon Inc. v. Alexander Manufacturing Company, 423 F.2d 91 (5th Cir. 1970); Zero Manufacturing Co. v. Mississippi Milk Pro. Ass'n, 358 F.2d 853 (5th Cir.), cert. denied, 385 U.S. 841, 87 S.Ct. 93, 17 L.Ed.2d 74 (1966); Mannix Company v. Healey, 341 F.2d 1009 (5th Cir. 1965)
 
 
 [5]
 See, e. g., Cathodic Protection Service v. Am. Smelting, Etc., 594 F.2d 499 (5th Cir.), cert. denied, 444 U.S. 965, 100 S.Ct. 453, 62 L.Ed.2d 378 (1979); Steelcase, Inc. v. Delwood Furniture Co., Inc., 578 F.2d 74 (5th Cir. 1978), cert. denied, 440 U.S. 960, 99 S.Ct. 1503, 59 L.Ed.2d 774 (1979); Parker v. Motorola, Inc., supra; Gaddis v. Calgon Corporation, 506 F.2d 880 (5th Cir. 1975); Van Gorp Mfg., Inc. v. Townley Industrial Plastics, Inc., 464 F.2d 16 (5th Cir. 1972)
 
 
 [6]
 In addition to the mandatory criteria with which to frame judicial determinations as to obviousness, the Supreme Court also set forth several permissive or "secondary" considerations: "commercial success, long felt but unresolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." 383 U.S. at 17-18, 86 S.Ct. at 694
 
 
 [7]
 Even without Dr. Minnick's testimony we are not required to take sides in the forensic contest between plaintiff's and defendants' witnesses, all of whom bore impressive credentials. In Ziegler v. Phillips Petroleum Company, 483 F.2d 858, 861 (5th Cir. 1973), cert. denied, 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1974), we stated: "Because the scientific underpinnings of chemical patents are so complex, trial courts must depend heavily upon expert witnesses .... Similarly, appellate courts must rely heavily upon the findings and credibility choices made by trial courts. Otherwise, we would be thrust into the position of reconsidering credibility and re-resolving conflicts in expert testimony, a position that mistakes this Court's function." See also Bird Provision Co. v. Owens Country Sausage, Inc., supra
 
 
 [8]
 "(N)o matter how much skepticism an invention is met with and no matter how much acclaim it eventually receives as an innovation, if the elements comprising the invention are disclosed by an examination of the prior art, it is irrelevant that no one previously availed himself of the knowledge." Hart v. Baarcke, 396 F.Supp. 408, 414 (S.D.Fla.1975), aff'd, 550 F.2d 353 (5th Cir. 1977)